1   Derek Milosavljevic  (SBN 255134)
    KIRKLAND & ELLIS LLP
2   333 South Hope Street
    Los Angeles, California  90071
3   Telephone:  (213) 680-8400
    Facsimile:  (213) 680-8500
4
    Eric Leon *(pro hac vice application to be filed)*
5   eric.leon@kirkland.com
    Claudia Ray *(pro hac vice application to be filed)*
6   claudia.ray@kirkland.com
    Robert Cohen *(pro hac vice application to be filed)*
7   robert.cohen@kirkland.com
    Mark Rasmussen *(pro hac vice application to be filed)*
8   mark.rasmussen@kirkland.com

9   KIRKLAND & ELLIS LLP
    601 Lexington Avenue
10  New York, New York 10022-4611
    Telephone:  (212) 446-4800
11  Facsimile:  (212) 446-4900

12
    *Attorneys for Plaintiff*
13  *TechForward, Inc.*

14

15              UNITED STATES DISTRICT COURT

16          FOR THE CENTRAL DISTRICT OF CALIFORNIA

17
    TECHFORWARD, INC.,
18                                      **CV11-01313**JC
            Plaintiff,
19                                      CIVIL CASE NO.
        vs.
20                                      **COMPLAINT FOR
    BEST BUY CO., INC.,                 MISAPPROPRIATION OF TRADE
21                                      SECRETS AND BREACH OF
            Defendant.                  CONTRACT**
22

23                                      **JURY TRIAL DEMANDED**

24

25

26

27          Plaintiff TechForward, Inc. ("TechForward") for its complaint against

28  Best Buy Co., Inc. ("Best Buy") hereby demands a jury trial and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that TechForward and defendant are citizens of different States and the amount in controversy is in excess of $75,000.

2.      This Court has personal jurisdiction over defendant in that defendant, at all relevant times, had continuous and systematic business contacts with the State of California. Additionally, this Court has personal jurisdiction over defendant in that a substantial part of the events giving rise to the causes of action asserted herein occurred in the State of California.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the causes of action asserted herein occurred in this District.

## PARTIES

4.      Plaintiff TechForward, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

5.      Defendant Best Buy Co., Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

## OVERVIEW OF COMPLAINT

6.      This case arises out of Best Buy's blatant misappropriation of TechForward's trade secrets. TechForward -- a small, California-based start-up company -- spent years developing highly confidential and propriety information to enable electronics retailers to implement a "buyback" program. Under the TechForward buyback program, known as the Guaranteed Buyback Plan, the retailer's customers pay for the right to redeem newly-purchased electronic devices at a future date in exchange for a store credit that is a percentage of the purchase price. TechForward was able to develop these trade secrets only after years of successfully implementing the Guaranteed Buyback Plan at companies such as Dell, RadioShack, Tiger Direct and CompUSA.

7.     Best Buy -- a Fortune 100, publicly-traded company with more than $45 billion in annual revenue -- for years tried to develop a buyback program on its own, but to no avail.  Although Best Buy allocated substantial resources to the project, employing an internal team and contracting with McKinsey & Company to help in the development process, it was unsuccessful.  Consequently, Best Buy looked to TechForward for a solution.  Unbeknownst to TechForward, however, Best Buy had no intention of paying for TechForward's help.  Instead, Best Buy stole TechForward's trade secrets and then cast the company aside while using TechForward's trade secrets to implement its own buyback program.

8.     Holding out the prospect of a partnership with a multi-billion dollar company, Best Buy induced TechForward to disclose highly confidential and proprietary information that is at the very heart of TechForward's Guaranteed Buyback Plan.  After entering into a confidentiality and non-disclosure agreement as well as an operating agreement that contains confidentiality provisions, Best Buy and TechForward collaborated on developing and implementing a "pilot program" selling TechForward's Guaranteed Buyback Plan in selected Best Buy stores in California.  After this pilot program proved to be a success, Best Buy came to TechForward with an "urgent" proposal:  Best Buy wanted to partner with TechForward and launch a nationwide buyback program.  As part of these discussions, Best Buy required TechForward to share highly confidential and propriety information that TechForward had never revealed to any other retailer.

9.     TechForward agreed to provide this information because it knew that the confidentiality and non-disclosure agreement was in place and had received additional verbal assurances that Best Buy would only use the information in evaluating a partnership with TechForward.

10.    But just six weeks after demanding and receiving TechForward's trade secrets together with a detailed explanation of those trade secrets from TechForward

1  executives, Best Buy abruptly ended discussions with TechForward about a

2  nationwide roll out of the Guaranteed Buyback Plan at Best Buy stores.

3       11.    Shortly thereafter, Best Buy announced to the world that it was

4  implementing its own buyback program -- called the Buy Back Plan ("BBP") -- which

5  is virtually identical to TechForward's Guaranteed Buyback Plan in its program

6  structure, marketing materials and terms and conditions.  To make matters worse, the

7  Best Buy executives who supposedly "developed" this buyback program are the exact

8  same executives who worked with TechForward on the pilot Guaranteed Buyback

9  Plan program for Best Buy and who received TechForward's highly confidential

10  information.

11       12.    Not only did Best Buy launch a buyback program using TechForward's

12  propriety data, it did so in a big way.  For the first time in its history, Best Buy bought

13  advertising during the Super Bowl, which aired on February 6, 2011.  The Super Bowl

14  advertisement, which featured Ozzy Osbourne and Justin Bieber, was devoted entirely

15  to the BBP.

16       13.    In view of Best Buy's unlawful conduct, described in greater detail

17  below, TechForward seeks: (i) compensatory and punitive damages for Best Buy's

18  misappropriation of TechForward's trade secrets in an amount to be determined at

19  trial; (ii) compensatory damages for Best Buy's breach of the non-disclosure

20  agreement; (iii) the costs of this action, including attorneys' fees; and (iv) such other

21  relief as this Court deems appropriate

22  **FACTS**

23  **TechForward's Guaranteed Buyback Plan**

24       14.    TechForward was founded in 2005 by its current Chief Executive

25  Officer, Jade Van Doren, and its current Chief Operating Officer, Marc Lebovitz.  The

26  company has spent several years and millions of dollars developing an innovative

27  product -- its Guaranteed Buyback Plan -- for consumers of computers and other

28  electronics.  The Guaranteed Buyback Plan, which is purchased by a consumer

1   concomitantly with the purchase of a wide range of electronic equipment (such as a

2   phone, computer, television, or monitor), gives consumers the flexibility to upgrade

3   their electronics affordably and easily.  The Guaranteed Buyback Plan locks in trade-

4   in values for the purchased electronic at the point of sale for up to two years in the

5   future, which makes upgrading to a new device more affordable down the road.

6        15.   When customers are ready to upgrade, they simply send their old device

7   to TechForward using the free boxes, shipping labels, and packing materials provided

8   by TechForward.  Customers then receive a guaranteed store credit, the amount of

9   which varies depending on how long they have owned the turned-in item and its

10  condition, that they can use toward the purchase of a new device.  TechForward

11  ensures all returned devices are re-used or recycled in an environmentally-friendly

12  manner.

13       16.   As an example, a consumer who purchases a tablet computer from

14  CompUSA can buy a TechForward Guaranteed Buyback Plan for approximately $40.

15  The consumer is then entitled to a store credit ranging from 50% to 20% of that

16  purchase price, depending on when the device is shipped to TechForward and the

17  condition of the device.  The consumer is issued the credit once TechForward receives

18  the device, and TechForward then either refurbishes and sells the old device or

19  recycles it.

20       17.   While the Guaranteed Buyback Plan may sound relatively

21  straightforward, its success as a business model involves a comprehensive

22  understanding of, and experience with, a wide range of factors that often have a

23  complex interplay with one another.  For instance, one of the critical tasks for

24  TechForward, or any company running a similar program, is the management of

25  financial and operational risk related to the payment of store credits to consumers.  In

26  other words, a central question is how much cash reserves a company, or its

27  underwriter, must maintain in order to cover the store credits issued to consumers who

28  exercise their buyback rights under the plan.  In order to maximize the profitability of

1    the program, any company would only want to maintain the minimum reserves

2    necessary to satisfy the projected buyback obligations.

3         18.    An essential piece of data in answering this question and managing the

4    program as a whole is the "exercise rate," or the percentage of plan holders who

5    actually send in their devices and qualify for a store credit.  This information simply

6    cannot be modeled in an accurate way and is not available from any public source.

7    The only way to obtain reliable data is to have actual experience running the program

8    over a period of years.  TechForward has built up detailed data on exercise rates

9    across a wide variety of electronic devices through its experience of selling tens of

10   thousands of plans over more than four years of operations with a variety of retailers.

11        19.    In addition to the exercise rate itself, TechForward has information on

12   how to profitably influence exercise rate behavior for specific devices that is critical to

13   the program's management.  This information is, itself, a complex interplay among a

14   number of factors including knowledge about the depreciation rates, predictability of

15   pricing, and residual values of the devices on the secondary markets, and consumer

16   behavior with respect to categories of electronics.  Once again, this is precisely the

17   type of proprietary data that TechForward has developed and analyzed based on its

18   experience of selling and managing the Guaranteed Buyback Plan over a period of

19   years with multiple retailers.

20        20.    A number of other factors are also critical to the effective and profitable

21   running of a buyback program.  By way of example, pricing methodology; historical

22   cash cycle analyses; the impact of consumer electronic marketplace disruptions on

23   pricing and risk; adverse and positive selection modeling; and operational scalability

24   are all areas that can have a significant impact on the program, especially one that is

25   national in scope.  Here, too, TechForward has developed and analyzed the relevant

26   data on these, and other, aspects of its Guaranteed Buyback Plan.

27        21.    TechForward has numerous systems and agreements in place to protect

28   trade secrets like these.  All TechForward employees and contractors have signed non-

1  disclosure agreements, and systems that contain such data are protected by a Virtual

2  Private Network (VPN), to which only certain TechForward employees have access.

3  TechForward's trade secrets are shared with TechForward employees only on a need-

4  to-know basis, and only disclosed to retail partners after a non-disclosure and

5  confidentiality agreement has been executed.

6       22.    Given the unique nature of the Guaranteed Buyback Program and

7  TechForward's experience in managing and developing it, this data as well as the

8  methodologies and analyses that TechForward had created were not available to Best

9  Buy or any other entity.

10  **TechForward's Pilot Program at Best Buy**

11       23.    Starting in the summer of 2005, TechForward had multiple

12  communications with Best Buy about the possibility of launching TechForward's

13  Guaranteed Buyback Plan at Best Buy stores.

14       24.    After numerous communications over a period of several years, the

15  companies signed a confidentiality and non-disclosure agreement on February 25,

16  2008 (the "NDA").  According to the NDA, the parties agreed to "maintain the

17  confidentiality of information that has been and will continue to be shared by the

18  Parties as may be necessary to initiate and/or maintain a successful business

19  relationship."  Under the express terms of the NDA, Best Buy further agreed "not to

20  use [TechForward's] confidential information for any purpose other than that for

21  which it is disclosed."

22       25.    TechForward later learned that Best Buy had been attempting to develop

23  a similar program on its own, with no success.  On January 10, 2009, Mr. Van Doren

24  and Mr. Lebovitz of TechForward, together with Mike Ryan (then a TechForward

25  sales consultant), met with Steve Gusa (then Best Buy's Senior Director of Geek

26  Squad Services) at the Consumer Electronics Show in Las Vegas.  Mr. Gusa explained

27  that he had reviewed non-confidential introductory materials TechForward had sent

28  him in 2007 and that Best Buy had subsequently tried to develop a similar product

1    itself.  According to Mr. Gusa, he had created a team within Best Buy and had

2    contracted with McKinsey & Company in an effort to create Best Buy's own buyback

3    program.  Those efforts, however, were not proving particularly fruitful: Mr. Gusa

4    informed TechForward that Best Buy was still at least nine months away from what

5    he called "product definition, " at which point Best Buy would need to begin actual

6    development of the computer systems, marketing and training materials necessary to

7    operate the program, and find a third party to underwrite the program.  Mr. Gusa

8    additionally explained that the internal team working on the product had been

9    "decimated" in a recent corporate reorganization.

10           26.    On October 13, 2009, Mr. Van Doren, Mr. Lebovitz and Mike London (a

11   member of TechForward's Board of Advisors and a former Best Buy executive) met

12   with a number of Best Buy officials in the offices of Dealtree, a TechForward resale

13   partner that recently had been acquired by Best Buy.  At that meeting, Kurt Hulander,

14   Best Buy's Managing Director of Growth Initiatives, threw his support behind a pilot

15   program in which TechForward's Guaranteed Buyback Plan would be offered in a

16   limited number of Best Buy stores.

17           27.    Over the next several months, TechForward worked diligently with Best

18   Buy executives and managers, including Kevin Deegan (Director of Risk

19   Management), Kurt Hulander, Angela Melcher (Design/Developer for Retail

20   Training), and Jessica Sanders (Strategic Planning Manager, Secondary Markets) to

21   prepare the pilot program.  In a meeting at Best Buy's headquarters on March 12,

22   2010, for the purpose of evaluating the proposed TechForward pilot program at Best

23   Buy, TechForward explained briefly some of its proprietary and trade secret risk

24   management strategies to Mr. Deegan, who approved the test from a financial and risk

25   management perspective, with the caveat that Best Buy would want additional

26   information before approving a national launch.

27           28.    On April 9, 2010, Best Buy and TechForward entered into an agreement

28   setting forth the details of the pilot program (the "Operating Agreement.")  Under the

1   Operating Agreement, Best Buy promised not to use any confidential and trade secret

2   information it obtained from TechForward during the course of the pilot program "for

3   any purpose except as is expressly permitted" in the Agreement.

4        29.   On April 11, 2010, the pilot program launched in twelve Best Buy stores

5   located in the greater Los Angeles area.  The initial Guaranteed Buyback Plans

6   covered desktop and laptop computers, LCD monitors, flat-panel televisions,

7   camcorders, Blu-ray Disc players, digital cameras, MP3 players, and GPS devices.

8        30.   The pilot program was a success.  Indeed, as early as May 15, 2010, Best

9   Buy and TechForward discussed expanding the program to other stores.  And in early

10   June 2010, TechForward was working with Best Buy, including Butch Cavello

11   (Senior Director) and Kevin Winneroski (Vice President for Secondary Markets) to

12   include mobile phones as part of the expansion.  On August 15, 2010, the pilot

13   program expanded to cover mobile phones and tablet computers in the pilot stores.

14   **Best Buy Obtains TechForward's Trade Secrets**

15        31.   On August 24, 2010, Best Buy told TechForward that it was interested in

16   something far more extensive than a mere expansion of the pilot program.  Rather,

17   Best Buy was contemplating a partnership with TechForward for a buyback program

18   that would be national in scope and accompanied by "large-scale national

19   promotions."  Describing the proposal as "fairly urgent," Mr. Winneroski, a member

20   of Best Buy's senior leadership team, emailed Mr. Van Doren of TechForward:

21

22        I have a ***fairly urgent proposal*** that I need to run by you.
     As you are aware, ***the buy back concept has been***

23   ***resonating well within the company,*** and some recent
     concept screenings that our marketing team completed

24   reinforced the fact that this is need [*sic*] for the consumer
     that scores at the top end of the range.  We are in the

25   process of planning our post-holiday ad campaigns, and

26   ***there is interest from the marketing team in doing***
     ***large-scale national promotions around buy back.***

27   Given the tight time frames that we are talking about and

28

the amount of heavy lifting required, *I need to discuss with you whether this is something you believe is possible.  I would also like to talk about what it potentially means from our side if we were to do buy-back at scale with TechForward as a partner.* ... I know this is short notice, but appreciate everyone's flexibility.  (Emphases added.)

32.     Mr. Van Doren responded that TechForward was "committed to making this work for everyone."  To this end, on September 1, 2010, Mr. Van Doren, Mr. Lebovitz, Clay Buckley (TechForward's Chief Revenue Officer) and Mr. London flew to Best Buy's headquarters in Richfield, Minnesota for a day-long meeting.

33.     In advance of the meeting, Mr. Winneroski of Best Buy circulated a detailed agenda via email on August 30, 2010.  According to the agenda, the meeting was to be divided into multiple segments where various groups of executives from Best Buy would discuss with TechForward specific aspects of the buyback project, including among other things (i) a review of the current pilot project, (ii) plans for marketing the Guaranteed Buyback Plan, and (iii) an in-depth review of financial risk management.

34.     With respect to financial risk management, Best Buy's agenda contained a number of very specific requests for highly confidential TechForward information, including:

- TechForward's valuation of each piece of its Guaranteed Buyback Plan, from consumer purchase to the issuance of store credit.

- TechForward's cash conversion cycle and how this cycle needs to work for TechForward to be profitable.

- Assumptions and data for exercise rates and breakage that are built into TechForward's model.

- The calculations and assumptions underlying the residual valuations in TechForward's model and what the residual values are by product category at various break points.

- Volume sensitivities in TechForward's model indicating the volumes at which the model is sub-optimized and ideally optimized, as well as the breakage point.

- TechForward's accrual strategy for future liabilities and its protection against catastrophic loss.

- TechForward's risk mitigation plans for administration of the program in the event TechForward no longer exists.

- Instruments, strategies or roles that Best Buy could employ to help mitigate any risk for TechForward.

35.   Recognizing the extremely commercially sensitive nature of the discussions Best Buy contemplated for the meeting, Mr. Winneroski said in the email:

> We understand and respect that Tech Forward is a private company, and that ***many of the questions that we will ask may be outside the boundaries of what would normally be discussed*** – however given the scope of what we are planning, hopefully it will be more apparent why we need to ask these questions, and why ***your being forthcoming and as transparent as possible is necessary for us to be able to move forward.***  (Emphases added.)

36.   At the start of the meeting on September 1, 2010, Mr. Winneroski and Ms. Sanders reviewed with TechForward the results from the pilot program.  They were then joined by two more Best Buy executives -- Dan Levinson and Ryan Fulton -- who shared the positive results of Best Buy's focus group study on buyback plans. Notably, Best Buy informed TechForward that when the marketing group commenced the study it was unaware of the pilot program with TechForward.  Upon learning of the program, Best Buy said, the marketing group incorporated specific aspects of TechForward's Guaranteed Buyback Plan into its research, including the identical tiered structure and corresponding time frames that TechForward uses to determine the percentage of the purchase price a customer is to receive as store credit upon return of the electronic device.  The positive feedback from the marketing group's

1   research, Best Buy told TechForward, provided the basis to move forward with a

2   national program.

3         37.   In that regard, Best Buy wanted assurances that TechForward could

4   manage the financial and operational risk associated with a nationwide program.

5         38.   While TechForward had grown its business through relationships with

6   national retailers, at the time of the September 1st meeting it was still a small

7   company with less than a dozen employees.  A partnership with a Fortune 100

8   company and the nation's premiere retailer of consumer electronic equipment was an

9   opportunity TechForward's executives were eager to pursue.  Thus, in order to give

10  Best Buy the confidence it said it wanted about financial risk management, and in

11  reliance on the parties' NDA, Operating Agreement and Best Buy's verbal assurances,

12  TechForward presented to Best Buy's executives some of the most sensitive and

13  critical information and data about its business.  This included information that

14  TechForward had always kept secret and had not shared with any of its prior or

15  current partners.

16        39.   Before beginning TechForward's presentation, Mr. Lebovitz again

17  reminded the Best Buy executives in the room -- Mr. Winneroski, Ms. Sanders, Mr.

18  Deegan, Paul Dunn  (Finance Director), Sean Stephens (Senior Director, Geek Squad

19  Services) as well as Winnie Zeng and Matt Ingle, both from Best Buy Capital --  about

20  the importance of maintaining the confidentiality of the information TechForward was

21  about to share, noting that TechForward had never shared most of the information

22  with any other retailers.

23        40.   Mr. Lebovitz then presented a series of PowerPoint slides and an Excel

24  spreadsheet containing a cash flow and risk model to the Best Buy executives.  Over a

25  period of several hours, TechForward's representatives provided detailed explanations

26  and answered probing questions from Best Buy executives that revealed considerable

27  trade secret information about TechForward's Guaranteed Buyback Plan that was

28

crucial to its operation and success.  Among the trade secrets that TechForward provided to Best Buy at the September 1st meeting were the following:

a.   <u>Exercise Rates.</u>  As noted above, an absolutely critical part of managing the financial risk associated with the Guaranteed Buyback Plan is knowing what percentage of customers actually exercise their rights under the plan and the timing of when they choose to do so, which TechForward calls exercise behavior.  Knowing the exercise rate and exercise behavior, especially with respect to categories of electronic devices, allows a company to determine properly several key elements, including the amount of reserves to set aside, and the projected volume of returned devices at any given time.  Too small of a reserve can obviously imperil the program.  But if a company maintains a reserve that is unnecessarily large, it will have to increase the price of the product to consumers, which would result in a reduction of sales and profitability.  The volume of returned devices is critical to understanding the resale and refurbishment capacity a company would need to have in place to offer such a program.  For instance, if every single device sold with a plan is returned, the sheer volume of devices and customer claims could overwhelm the logistics and operations of even a large retailer.  TechForward, of course, had collected and analyzed a considerable amount of data related to exercise rates and behavior for its Guaranteed Buyback Plan.  At the September 1st meeting, TechForward spent considerable time explaining this crucial information to Best Buy executives.

b.   <u>Profit Center Comparison to Warranty Programs.</u>  TechForward shared highly proprietary information with Best Buy executives that contrasted the Guaranteed Buyback Plan with warranty plans.  The information included an explanation of where profit centers can exist within a buyback plan that are absent in warranty plans.  Once again, this proprietary, non-public information

was the result of data collection and analysis done by TechForward based on its previous experience with the Guaranteed Buyback Plan over a period of several years with various retailers.

c.   <u>Strategies to Influence Exercise Behavior.</u>  TechForward also provided Best Buy executives with non-public information relating to its strategies and techniques for influencing the exercise rate for specific devices through positive selection levers.  Such knowledge would help a company maximize profits, respond to changes in the secondary markets for the device, and optimize the plans for their customers.  Additionally, this information is important in mitigating the risk associated with the guaranteed store credits that are at the heart of the buyback program.

d.   <u>Cash Cycle and Reserves.</u>  TechForward provided Best Buy with information and analysis that showed how the cash reserves TechForward established have historically been sufficient to meet customer payment obligations under the plans, information which TechForward had never shared with any of its retail partners.  The data, in conjunction with the exercise rates, provided Best Buy with critical information concerning how the buyback program can be managed while avoiding the need to maintain unnecessarily large cash reserves.

e.   <u>Pricing.</u>  Another critical part of a successful Guaranteed Buyback Plan is the ability to set prices at the right level to make the plan appealing to customers and profitable to the retail partner.  Once again, exercise rates play a critical role in setting pricing.  TechForward shared with Best Buy the proprietary methodology it had developed, using exercise rates and other data, to establish pricing for various options under the Guaranteed Buyback Plan.

f.   <u>Resale Pricing, Scalability, Depreciation and Risk.</u>  The resale of

-14-

devices returned by consumers is a vital component of the Guaranteed Buyback Plan.  Among the many factors that bear on the resale of the devices are the prices at which they can be resold and what impact the Guaranteed Buyback Plan (by virtue of injecting potentially a large number of devices into the secondary markets) will have on pricing.  Additionally, the introduction of new consumer electronics can affect product category depreciation for old devices and have other impacts in the secondary markets.  TechForward provided Best Buy with its proprietary analyses of these factors in the context of the Guaranteed Buyback Plan, explaining their relative significance with respect to pricing and profitability, in addition to a projected residual value schedule for devices expected to be sold under the Best Buy program.  This projected residual value schedule was developed through extensive and proprietary analytical techniques developed by TechForward and applied to sales data the company had licensed from secondary markets.  TechForward also presented yet another proprietary analysis showing how accurate its predictions relating to secondary market pricing need to be in order to achieve desired margins.

g.    Proprietary Systems and Historical Predictions.  Along with its extensive analyses of the factors identified above, TechForward had developed its own proprietary systems (i) to manage risk (including Value at Risk Analyses), (ii) to project the depreciation of used devices, (iii) to analyze exercise-rate behavior, (iv) to set up front fees, and (v) to perform data mapping and data integration tasks.  TechForward provided Best Buy with outlines and examples of all these systems, none of which were available to Best Buy from any other source.

41.    After TechForward had finished its presentation and answered numerous questions from the Best Buy executives and managers in the room, Mr. Dunn (Best Buy's Finance Director) asked Mr. Lebovitz to send him TechForward's proprietary

1    and highly confidential cash reserve model spreadsheet as well as an electronic copy

2    of the PowerPoint presentation TechForward had just made.  Mr. Dunn said that

3    having the spreadsheet in his hands "would save me time from having to build it

4    myself."  Mr. Dunn noted that he would need to build something very similar to

5    TechForward's cash reserve model to convince Best Buy executives that TechForward

6    could manage the risk.

7         42.   Mr. Lebovitz agreed to send Mr. Dunn the requested information,

8    reiterating that it was confidential and proprietary.  Mr. Van Doren again stressed that

9    the Best Buy executives and managers in the room were not to share the information

10   with anyone, including other Best Buy employees who were not involved in reviewing

11   an expanded relationship between Best Buy and TechForward.  At that point, Mr.

12   Winneroski agreed that the information would only be shared among Best Buy

13   employees who were working on the TechForward matter.  He then noted that sending

14   Mr. Dunn the information would "save time" for Best Buy.  At the end of the meeting,

15   George Sherman, Best Buy's Senior Vice President of Services, personally recapped

16   with TechForward the day's discussions and next steps, including the proprietary

17   nature of information shared by TechForward.

18        43.   Relying on the existence of the NDA and the confidentiality provisions

19   of the Operating Agreement, as well as the fact that Best Buy had, again, reaffirmed

20   its obligations to use the information TechForward was providing only for the

21   purposes of evaluating a relationship with TechForward, after the meeting Mr.

22   Lebovitz emailed Mr. Dunn copies of a cash reserve modeling spreadsheet, and a copy

23   of a large portion of TechForward's PowerPoint presentation.  These documents and

24   the information contained in them go the very heart of TechForward's proprietary and

25   highly confidential risk management strategies that it had developed based on its

26   extensive experience with its Guaranteed Buyback Plan.  The email also included

27   information about the escrow account that TechForward had established with other

28

1    retailers.  Most of the information disclosed in the email was not otherwise available

2    to Best Buy from any source other than TechForward.

3         44.    On September 7, 2010, during a meeting with TechForward at Best

4    Buy's headquarters, Mr. Dunn asked for a revised cash reserve spreadsheet.  The

5    information that Mr. Dunn requested would enable Best Buy to estimate, with more

6    precision, the profitability of the program.  Relying on the NDA, the confidentiality

7    provisions of the Operating Agreement, and believing that Best Buy would live up to

8    its promises that it would only use this information to evaluate a partnership with

9    TechForward, Mr. Lebovitz emailed Mr. Dunn the requested revision.

10        45.    Notably, later that evening, Mr. Van Doren, Mr. Lebovitz, Mr. Buckley

11   and Mr. London had dinner with Mr. Winneroski and Mr. Hutto from Best Buy.  At

12   the dinner, Mr. Hutto reiterated that Best Buy needed a partner to move forward with

13   a buyback program and that TechForward was the only viable option.  Mr. Hutto

14   explained that any outstanding issues would not be an obstacle to becoming partners

15   with TechForward, and that Best Buy and TechForward could work together to

16   resolve those matters.

17        46.    Best Buy's efforts to access TechForward's highly confidential

18   information did not end on September 7, 2010.  Best Buy also requested, ostensibly as

19   part of its diligence, to visit TechForward's office to see, first hand, the systems

20   TechForward had described and explained at the September 1st meeting.  So, on

21   September 22, 2010, TechForward did something it had never done with any other

22   retailer: it opened up its offices and internal systems for inspection by Mr. Stephens

23   and Mr. Ingle of Best Buy.

24        47.    The day-long meeting on September 22, 2010 at TechForward's offices

25   included demonstrations, using real data, of TechForward's key systems.

26   TechForward also provided Best Buy with answers to several questions Best Buy had

27   relating to operational details, financials, and technical capabilities.  Included in the

28   discussion was technical information on how TechForward projects residual values,

1   how TechForward influences customer exercise behavior, how TechForward

2   determines the type of exercise behavior it wishes to promote, how TechForward

3   routes devices for resale to maximize resale profitability, and how TechForward

4   supports customers through a Customer Relationship Management system for its

5   outsourced call-center agents.  Again, this was all highly confidential information that

6   TechForward had never provided to another retailer, and that was not available to Best

7   Buy from any other source.

8   **Best Buy Wrongfully Uses TechForward's Trade Secrets**

9        48.   On October 19, 2010, Best Buy hastily, and unexpectedly, ended its

10   relationship with TechForward.  At a meeting at Best Buy's headquarters, Mr. Hutto

11   and Mr. Winneroski told TechForward that Best Buy would be moving forward with

12   the buyback program on its own.

13        49.   Best Buy's termination of the relationship and decision to undertake the

14   buyback program alone came just six weeks after TechForward responded to Best

15   Buy's "urgent" request and provided Best Buy with detailed, highly confidential and

16   proprietary information about the inner workings of TechForward's Guaranteed

17   Buyback Plan.

18        50.   Best Buy did keep one part of its promise to TechForward -- it launched a

19   national buyback program accompanied by major media advertising just eleven weeks

20   after suddenly ending the relationship with TechForward.  On January 10, 2011, Best

21   Buy officially announced its Buy Back Program.  Best Buy had previously told

22   TechForward that it needed approximately six weeks to print and distribute in-store

23   materials for a buyback program.  Thus, Best Buy fully "developed" the BBP, which

24   is national in scope, only five weeks after terminating the relationship with

25   TechForward.

26        51.   The BBP is nearly identical in its key components to TechForward's

27   Guaranteed Buyback Plan.  For instance, the BBP copies the precise term structure of

28   the Guaranteed Buyback Plan and provides a store credit of 50% for a return within

1 | six months of purchase, 40% for a return within 12 months, 30% for a return within

2 | 18 months, and 20% for a return within 24 months.  (In a transparent effort to

3 | differentiate the BBP from the Guaranteed Buyback Plan, Best Buy has added an

4 | additional category for plans sold with televisions -- a 10% credit for a return within

5 | 48 months.)

6 |       52.       Additionally, the BBP uses identical terminology to that in

7 | TechForward's Guaranteed Buyback Plan to rate the condition of the returned

8 | devices:  Good, Poor, and Substantially Impaired.  The penalties BBP assesses for a

9 | device that is in Poor or Substantially Impaired condition are also identical to the

10 | penalties in the Guaranteed Buyback Plan:  a 50% reduction in store credit for a

11 | device in Poor condition and no store credit for a device that is Substantially Impaired.

12 |       53.       Best Buy clearly thinks its buyback program is big news.  In fact, Best

13 | Buy was so enamored with the BBP and the potential it has to generate revenue,

14 | increase customer loyalty, and draw in new customers, that it bought some of the most

15 | expensive television advertising time in the world.  On February 6, 2011, Best Buy --

16 | for the first time in its history -- aired a Super Bowl commercial, one that featured

17 | international musical stars Ozzy Osbourne and Justin Bieber.  Prior to the ad running,

18 | Drew Panayiotou, Best Buy's Senior Vice President of U.S. Marketing, was quoted in

19 | the press as saying, "We feel like we have really big news that will revolutionize

20 | retailing.  It's innovative; it's first ever.  That's why the stage [the Super Bowl] is so

21 | important for us."

22 |       54.       Best Buy has continued to promote the BBP in the national media.  The

23 | Super Bowl commercial still airs on network television, and the company recently

24 | featured the BBP in a whole-page advertisement in the Wall Street Journal.

25 | Additionally, Best Buy has been promoting the BBP in conjunction with the

26 | company's sale of the iPhone for use on Verizon's network, and the BBP is

27 | prominently featured on the homepage of Best Buy's website.

28 |

55.     Given that the BBP is a near duplicate of TechForward's Guaranteed Buyback Plan, it is hardly surprising that Best Buy was able to launch the program in a relatively short period of time and announce it to the world on Super Bowl Sunday. But, the extraordinary similarities of the two products tell only part of the story. Best Buy, by its own admission, was not able to develop a buyback program on its own. Indeed, during the pilot program and while Best Buy was later coaxing highly sensitive information from TechForward, Best Buy did not, to TechForward's knowledge, maintain any separate working group -- much less one isolated and walled off from Best Buy employees involved with TechForward -- to develop a buyback product internally.

56.     Rather, what Best Buy needed and wanted was the help of TechForward because it would have taken Best Buy years to develop its own buyback program. Given Best Buy's failure to develop its own program in the past and the fact that, on information and belief, no other company was offering a buyback program comparable to TechForward's, the only way that Best Buy could have launched its own program within six weeks was to use TechForward's proprietary information in violation of the NDA and the Operating Agreement. Best Buy needed the information, analyses, methodologies, and insights that TechForward had amassed and worked so hard to develop. Once Best Buy had obtained this information -- through false promises of a partnership -- it threw TechForward out into the cold and shamelessly presented a carbon-copy product as its own. And it did so using many of the key individuals at Best Buy who worked with TechForward and had access to its confidential information.

57.     Notably, the Buy Back Program Agreement indicates that Best Buy is not the guarantor of its program; rather, the program is underwritten by an insurance company. Any reputable underwriter acting as a guarantor of a program like the BBP would have inquired about the level of risk the program entails as well as Best Buy's strategies for managing that risk. This information requires knowledge and

1   understanding of, among other things, the exercise rates of the products, the financial
2   risk analyses, and risk mitigation techniques.  Management of the risk also requires
3   that sophisticated systems and methodologies be in place to analyze the relevant data
4   that comes from a variety of sources, such as residual value projection, resale routing
5   techniques, and techniques to influence customer exercise behavior.  Best Buy
6   obtained this information and the ability to develop the appropriate methodologies and
7   systems from the confidential information given to it by TechForward.

8      58.   Simply put, without the knowledge and information that TechForward
9   supplied to Best Buy, the company would not have had the data and risk analysis
10  techniques necessary to assess and manage the risk associated with the BBP, convince
11  an underwriter to take on the risk associated with the program, and profitably run the
12  program.  And certainly Best Buy would not have been able to put in place a national
13  program of this complexity in a matter of weeks without an understanding -- provided
14  by TechForward -- of how to run the program from both a financial and operational
15  perspective.

16  ### FIRST CAUSE OF ACTION

17  (Misappropriation of Trade Secrets)

18     59.   TechForward incorporates by reference all of the allegations set forth in
19  paragraphs 1-58 above as though fully set forth and realleged herein.

20     60.   As alleged above, TechForward has developed and maintained valuable
21  proprietary information that derives independent economic value from not being
22  generally known to the public or to other people who can obtain economic value from
23  its disclosure or use.

24     61.   As alleged above, TechForward has made reasonable efforts under the
25  circumstances to maintain the secrecy of this information, including but not limited to,
26  entering into the NDA and repeatedly seeking commitments from Best Buy's
27  employees that they would not disclose the information that TechForward shared with
28  Best Buy.

62.    Accordingly, the information described above constitutes "trade secrets" under California's Uniform Trade Secrets Act, Civil Code § 3426 *et seq.*

63.    As alleged above, Best Buy acquired TechForward's trade secrets directly or indirectly from TechForward and not from generally available information or through its own independent research and efforts.  In addition, Best Buy acquired TechForward's trade secrets under circumstances giving rise to a duty to maintain the secrecy of and limit the use of the trade secrets.

64.    In acquiring this information, Best Buy knew or should have known that it was and still is under a duty to maintain the confidentiality of TechForward's trade secrets and limit the use of TechForward's trade secrets.

65.    In violation if those duties, Best Buy revealed TechForward's trade secrets to unauthorized recipients, without the express or implied consent of TechForward, and has used and intends to continue to use the trade secrets for its own benefit, without the express or implied consent of TechForward and to the detriment of TechForward.

66.    These actions constitute misappropriation of TechForward's trade secrets under California's Uniform Trade Secrets Act, Civil Code § 3426 *et seq.*

67.    Best Buy's misappropriation of TechForward's trade secrets has caused and will continue to cause TechForward to suffer substantial damages, including but not limited to losses suffered as a result of the disclosure of its confidential and proprietary trade secrets, as well as the loss of current and future business that could have been derived from the use of its confidential and proprietary trade secrets.  The amount of damages that TechForward has suffered will be proven at trial.

68.    As a result of Best Buy's misappropriation of TechForward's trade secrets, Best Buy has been unjustly enriched in an amount to be proven at trial.

69.    Best Buy's misappropriation of TechForward's trade secrets was also done willfully and maliciously and with the intent to improve its own business without

1   adequately compensating TechForward.  TechForward is therefore entitled to

2   exemplary damages in an amount to be proven at trial.

3   ### SECOND CAUSE OF ACTION

4   (Breach of Non-Disclosure Agreement)

5       70.    TechForward incorporates by reference all of the allegations set forth in

6   paragraphs 1-69 above as though fully set forth and realleged herein.

7       71.    TechForward and Best Buy entered into a valid and enforceable NDA,

8   under which the parties mutually agreed (a) to maintain the confidentiality of

9   information shared between the parties; (b) to not disclose any such information to

10  anyone except the parties' employees, agents, and consultants on a need-to-know

11  basis (and only after such employees, agents, and consultants had been informed of

12  and acknowledged their obligation to be bound by the terms of the NDA); and (c) to

13  not use such information for any purpose other than that for which it is disclosed.

14      72.    The NDA further provided that all confidential information that was

15  disclosed would remain the sole property of the party disclosing it and the receiving

16  party would have no right, title, or interest in or to the confidential information.

17      73.    The NDA was supported by consideration in the form of mutual

18  promises, assurances, and obligations set forth in the NDA.

19      74.    TechForward has performed all of the obligations required on its part in

20  accordance with the terms and conditions of the NDA.

21      75.    Best Buy breached the terms of the NDA by, among other things, (a)

22  failing to maintain the confidentiality of the information shared between the parties;

23  (b) disclosing the information to Best Buy's employees, agents, and third parties who

24  did not need to receive the information and/or who were not informed of and did not

25  acknowledge their obligation to be bound by the terms of the NDA; (c) using the

26  information for purposes other than that for which it was disclosed, including but not

27  limited to, using the information to develop the BBP as an alternative to

28  TechForward's Guaranteed Buyback Program; and/or (d) profiting from the use of the

-23-

1   information without adequately compensating TechForward as the owner of the

2   information.

3       76.    As a result of Best Buy's breach of the NDA, TechForward has suffered

4   damages in an amount to be proven at trial.

5                        **THIRD CAUSE OF ACTION**

6                      (Breach of Operating Agreement)

7       77.    TechForward incorporates by reference all of the allegations set forth in

8   paragraphs 1-76 above as though fully set forth and realleged herein.

9       78.    TechForward and Best Buy entered into a valid and enforceable

10  Operating Agreement for the purposes of conducting a pilot program in which

11  TechForward's Guaranteed Buyback Plan was offered in Best Buy stores in the

12  greater Los Angeles area.  Pursuant to the Operating Agreement, the parties mutually

13  agreed (a) to maintain in strict confidence all confidential information that each side

14  provided to other in the course of the pilot program; (ii) to not disclose any

15  confidential information to anyone except agents, consultants, and authorized vendors

16  on a need-to-know basis (and who are subject to a confidentiality agreement that

17  provides for protection of confidential information in a manner that is substantially

18  similar to the protections provided in this Agreement); and (iii) to not use any

19  confidential information for any purpose except as is expressly permitted under the

20  Operating Agreement.

21      79.    The Operating Agreement further provided that all confidential

22  information that was disclosed would remain the sole property of the party disclosing

23  it and the receiving party would have no right, title, or interest in or to the confidential

24  information.

25      80.    The Operating Agreement was supported by consideration in the form of

26  mutual promises, assurances, and obligations set forth in the Operating Agreement.

27      81.    TechForward has performed all of the material obligations required on its

28  part in accordance with the terms and conditions of the Operating Agreement.

82.    Best Buy breached the terms of the Operating Agreement by, among other things, (a) failing to maintain the confidentiality of the information shared between the parties; (b) disclosing the information to Best Buy's employees, agents, and third parties who did not need to receive the information and/or who were not informed of and did not acknowledge their obligation to be bound by the terms of the Operating Agreement; (c) using the information for purposes other than that for which it was disclosed, including but not limited to, using the information to develop the BBP as an alternative to TechForward's Guaranteed Buyback Program; and (d) profiting from the use of the information without adequately compensating TechForward as the owner of the information.

83.    As a result of Best Buy's breach of the Operating Agreement, TechForward has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

84.    Therefore, TechForward demands judgment against Best Buy as follows:

(a)    On the First Cause of Action, damages (including exemplary damages), in an amount to be determined at trial, for misappropriation of trade secrets under California's Uniform Trade Secrets Act, Civil Code § 3426 *et seq.*;

(b)    On the Second Cause of Action, damages for breach of contract in an amount to be determined at trial;

(c)    On the Third Cause of Action, damages for breach of contract in an amount to be determined at trial;

1        (d)    Attorneys' fees and costs; and

2        (e)    For such other and further relief as this Court may deem just and

3                proper.

4

5    Dated:  February 11, 2011              KIRKLAND & ELLIS LLP

6

7                                        Derek Milosavljevic  (SBN 255134)

8                                        KIRKLAND & ELLIS LLP
                                    33 South Hope Street

9                                        Los Angeles, California  90071
                                    Telephone:  (213) 680-8400

10                                       Facsimile:   (213) 680-8500

11                                       *Attorneys for Plaintiff TechForward, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28